**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRIAN RICH,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:13-1979** |
| **v.** | : | **(JUDGE MANNION)** |
| **JAY and ELIZABETH HOUSMAN,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court is the defendants' motion to dismiss made pursuant to Fed. R. Civ. Pro. 12(b)(2) and 12(b)(6). The motion argues that the case should be dismissed for lack of subject matter jurisdiction because the court does not have personal jurisdiction over the defendants and the amount in controversy does not meet the statutory threshold. The motion further contends that dismissal is appropriate because this court is an improper venue. Because the court finds it lacks personal jurisdiction over the defendants, the case will be dismissed.


## I.    Factual Background

This case arises from failed property transaction that occurred between July and December, 2012. The plaintiff, Brian Rich, owned a piece of property located in Ocean County, New Jersey that he put up for sale sometime before July 2012. The plaintiff is domiciled in Pennsylvania. In July 2012, the defendants, Jay and Elizabeth Hausman, offered to purchase the plaintiff's

New Jersey property. The defendants are domiciled in New York. After some negotiations between the parties, a contract for sale was drawn-up setting the selling price at $950,000. (Doc. 2). The contract for sale is entitled "NEW JERSEY ASSOCIATION OF REALTORS STANDARD FORM OF REAL ESTATE CONTRACT" and only applies New Jersey and federal laws. (Id.).

The defendants were required to secure a mortgage in the amount of $712,500 by October 15, 2012. If the defendants failed to obtain financing, either party "may void this agreement by written notice to the other party." According to the contract, the plaintiff was represented by LBI Realty Group, LLC, located in Ship Bottom, New Jersey. LBI Realty Group was also to hold the defendants' deposit of $95,000, which was transferred to that agency sometime before August 6, 2012. The defendants were represented by Anderson Agency, located in Haven Beach, New Jersey. The defendants signed the contract on July 31, 2012 in New York and then the plaintiff signed the contract in Pottsville, Pennsylvania on August, 2, 2012. According to the plaintiff, either the defendants or their agents forwarded the contract to him.[1]

After the October 15, 2012 deadline passed and the defendants were unable to obtain a mortgage, the defendants, through their New Jersey

---

[1]Although the parties disagree as to whether the contract was sent by the defendants or by the plaintiff's New Jersey realtor, the court assumes it was sent by the defendants to the forum state based on the plaintiff's affidavit. (Doc. 10, Att. 1).

2

counsel, contacted the plaintiff's attorney at his office in Pottsville, Pennsylvania. The defendants requested a two week extension to obtain the proper financing. (Doc. 10, Att. 2). After an exchange of several emails between counsel for both parties, they agreed to a two week extension with November 2, 2012 serving as the new closing date. Before that date came to pass, however, a massive storm system, better known as Hurricane Sandy or Super Storm Sandy, devastated New Jersey. This storm caused significant damage in Ocean County where the plaintiff's property was located. (Doc. 10, Att. 2).

On December 4, 2012, after the storm passed and the area began to recover, the defendants, through counsel, informed the plaintiff that they had again failed to obtain financing and were terminating the contract pursuant to the financing clause. The plaintiff's attorney responded that same day, stating the plaintiff wanted to see if he could use his banking contacts to obtain a mortgage or take the mortgage note on himself. The defendants' attorney said she would present the idea to the defendants. (Id.). Despite attempts to consummate the agreement, on January 4, 2013, the defendants again notified the plaintiff they were terminating the contract because they could not obtain financing. (Id.). They also noted that there was significant damage from Hurricane Sandy in the areas immediately surrounding the property. They requested the money held in escrow be returned immediately.

On March 15, 2013, the defendants' attorneys again contact plaintiff's

3

counsel and demanded the funds from the escrow account be released immediately. Between January and March, 2013, defendants' counsel attempted to call the plaintiff's attorney several times without success. Sometime before July 2013, the plaintiff sold the property for $925,000, $25,000 less than the contract price between the parties. (Doc. 10, Att. 1). After that sale, the plaintiff demanded $25,000 in exchange for releasing the remaining escrow funds.

On July 2, 2013, Defendant Jay Housman, representing himself and his wife, sent a letter to the plaintiff's attorney demanding the return of the funds held in escrow by the plaintiff's New Jersey realtor. In that letter, attorney Housman rejected the plaintiff's offer and demanded the return of the entire security deposit by July 8, 2013 at 5:00PM. If the plaintiff failed to follow these instructions, the defendants threatened legal action. (Doc. 10, Att. 3). It does not appear the plaintiff has released the $95,000 to the defendants at this juncture. This suit followed two weeks later.

## II.   Procedural Background

The plaintiff filed his complaint on July 22, 2013. (Doc. 1). The complaint asserts a single-count breach of contract claim, alleging damages of $150,000, excluding his $25,000 claim for attorneys' costs and fees, and the right to retain the $95,000 security deposit held in escrow. On September 19, 2013, the defendants filed a motion to dismiss, (Doc. 7), and brief in support,

(Doc. 8), claiming that the court lacks subject matter jurisdiction and also that this court is an improper venue. The plaintiff filed his brief in opposition on October 8, 2013. (Doc. 10). The defendants filed their reply brief on October 23, 2013. (Doc. 11). The plaintiff filed a sur-reply brief on October 30, 2013. (Doc. 12).[2] The case is now ripe for the court's decision.

## III.    Legal Standard

Rule 12(b)(2) provides for the dismissal of a complaint if the plaintiff fails to establish that the court has personal jurisdiction over a party. Fed.R. Civ.P.12(b)(2). Rule 12(b)(3) in conjunction with 28 U.S.C. §1391, requires the court to dismiss the case if the plaintiff fails to show that the district in which the suit is brought is the proper venue. Fed.R.Civ.P. 12(b)(3).

Rule 12(b)(2) requires the court to accept the truth of factual allegations in the complaint relating to jurisdiction and the reasonable inferences that flow therefrom unless the moving party produces evidence tending to contradict the existence of jurisdiction. *In re Chocolate Confectionary Antitrust Litigation*, 674 F.Supp.2d 580, 595 (M.D.Pa. 2009). In other words, a party may rely entirely on allegations unless and until the moving party presents the court

---

[2]The defendants filed a letter on October 31, 2013, noting the court had not granted leave for the plaintiff to file a reply brief pursuant to Local Rule 7.7. Although the defendants request the sur-reply brief "be rejected" by the court, given the discussion and reasoning discussed below, the court sees no prejudice to the defendants.

with actual evidence to the contrary. *Id.*; *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) ("when the court does not hold an evidentiary hearing on the motion to dismiss, . . . the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor."); *but see, e.g., Rodi v. S. New Eng. Sch. of Law*, 255 F.Supp.2d 346, 348 (D.N.J. 2003) ("the plaintiff may not rely on the pleadings, but rather must introduce sworn affidavits or other competent evidence.").

If the moving party does submit competent evidence refuting jurisdiction, the non-moving party shoulders the burden of establishing, by a preponderance of the evidence, that the court has jurisdiction over the matter. *In re Chocolate Confectionary Antitrust Litigation*, 674 F.Supp.2d at 595 ("Once these allegations are contradicted by an opposing affidavit, however, plaintiffs must present similar evidence in support of personal jurisdiction."). At this point, the plaintiff may not rely on bare pleadings but must support those pleadings with "actual proofs, not mere allegations." *Id.* (quoting *Patterson by Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990)). As such, "although the burden of persuasion always lies with the non-moving party, the burden of production rests initially with the party moving for dismissal under Rule 12(b)(2)." *Id.* at 595, n. 21.

## IV.    Discussion

Although the defendants initially raise the issue of whether the amount

in controversy has been satisfied, the court will first address whether it has personal jurisdiction over the defendants. "The Pennsylvania [long-arm] statute permits the courts of that state to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment." *Mellon Bank (East) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992). There is no allegation the court has general jurisdiction in connection to this matter, so only specific jurisdiction analysis is necessary.

The central question is whether the defendants purposefully availed themselves "of the privilege of conducting business within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The only contact the defendants had with Pennsylvania involved the negotiation, transmission, modification, and voiding of the land sale contract for the New Jersey property. "It is well established, however, that a nonresident's contracting with a forum resident, without more, is insufficient to establish the requisite 'minimum contacts' required for an exercise of personal jurisdiction over the nonresident." *Sunbelt Corp. v. Noble, Denton & Associates, Inc.*, 5 F.3d 28, 32 (3d Cir. 1993)(citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). In reviewing whether a party has sufficient minimum contacts, the Supreme Court has emphasized that courts should focus their analysis on the formative negotiations, along with the future consequences and obligations arising from the contract. *See*

*Burger King*, 471 U.S. at 478-79 (emphasizing a "highly realistic" approach "that recognizes that a 'contract' is 'ordinarily but an intermediate step serve to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction."(quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316-17 (1943)). Courts may look to the terms of the contract, the location and character of negotiations, the future consequences of the agreement, and the course of dealing between the parties to determine whether sufficient minimum contacts exist. *Mellon Bank*, 960 F.2d at 1223.

Given the contractual nature of this case, *Burger King* is particularly applicable. There, the defendant contracted with Burger King's Miami headquarters to open a franchise in Michigan. The parties engaged in substantial negotiations between February and June 1979. They entered into a contract upon the completion of their negotiations in June 1979. *Burger King*, 471 U.S. at 467. The agreement was governed by Florida law and established a 20-year relationship between the parties. Further, the defendant was required to pay over one million dollars during the life of the franchise contract. *Id.* When the defendant fell behind in his payments, he engaged in prolonged mail and telephone negotiations with the plaintiff's Miami office. It was Burger King's policy to deal with such disputes from its headquarters. *Id.* at 467 fn. 9. The Supreme Court held that the defendant's ongoing contact with the forum state, including availing himself to Florida law as part of the

8

contract, constituted sufficient minimum contacts whereby the federal district courts in Florida could exercise jurisdiction over him. *Id.* at 482.

Turning first to the contract, both parties were represented by New Jersey realtors. The contract itself involved property located in New Jersey. Based on the evidence, the negotiations did not occur in Pennsylvania, but were conducted by the parties' realtors and attorneys via telephone, email, and mail. The agreement was governed by New Jersey law and required the escrow funds be held by the plaintiff-seller's realtor in New Jersey. The final payment of the $712,500 obtained via mortgage was to be deposited with the same realtor prior to closing. The defendants' attorneys were based in New Jersey and had an office in New York as well. There is nothing within the contract itself to indicate that the defendants would be availing themselves to the laws and protections of Pennsylvania, save for contracting with a Pennsylvania resident. As such, it appears the contract reinforced the defendants deliberate affiliation with New Jersey rather than Pennsylvania. In sum, the contract and the nature of the agreement are significantly different than the one at issue in *Burger King*. These facts do not support a finding of specific jurisdiction over the defendants. *See* 471 U.S. at 483 (Florida choice-of-law provision "reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.").

The plaintiff further argues that the fact the contract was forwarded to him by the defendants or their agents for his signature in Pennsylvania,

9

combined with a few letters and emails from the defendants' attorneys,
constitute sufficient contact with the forum. Turning first to the signing of the
contract in Pennsylvania, the court is not persuaded that the mailing of a
contract regarding New Jersey property and governed by New Jersey law for
a necessary signature establishes personal jurisdiction. Such action does not
support the contention that the defendants "purposefully directed [their]
activities at residents of the forum and the litigation results from alleged
injuries that arise out of or related to those activities." *BP Chemicals Ltd. v.
Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir.
2000)(quotations and citations omitted). Moreover, the Supreme Court
recently clarified that the minimum contacts "analysis looks to the defendant's
contact with the *forum State itself*, not the defendant's contact with persons
who reside there." *Walden v. Fiore, et al.*, No. 12-574, 2014 WL 700098 (U.S.
Feb. 25, 2104)(emphasis added).

A brief discussion of *Walden* will also illuminate how "it is the
defendant's conduct that must form the necessary connection with the forum
State that is the basis for its jurisdiction over him." 2014 WL 700098 at *5. In
that case, a DEA agent seized the plaintiff's casino chips and cash at a
Georgia airport before the plaintiff boarded a flight to Las Vegas, Nevada. The
plaintiff's Nevada attorney subsequently contacted the DEA agent on three
occasions in an attempt to have the chips returned. The DEA agent then
drafted an affidavit to show probable cause for forfeiture, but no forfeiture

complaint was filed and the funds were eventually returned. *Id.* at \*2-\*3. The Supreme Court noted "that mere injury to a forum resident is not a sufficient connection to the forum" by which a court can find personal jurisdiction over a party. *Id.* at \*7. The Court further determined that although the DEA agent eventually returned the funds to Nevada, it was the plaintiff's unilateral decision to have the funds sent to the forum, rather than the agent's purposeful choice. *Id.* at \*8. Similar to the contract here, it was the plaintiff's location that dictated where the contract had to be sent, not the purposeful or deliberate activity of the defendants. Further, the New Jersey property has no connection or link to this forum beyond the plaintiff, like the casino chips in *Walden*. *See* 2014 WL 700098 at \*5 (noting that cash seized in Georgia owned by Nevada resident and with possible origins in Nevada was to attenuated connection to establish personal jurisdiction).

Here, the defendants actively availed themselves to the laws and protections of New Jersey through their selection of realtors, attorneys, governing law, and location of the property. As *Walden* discussed, the contact with one individual who happens to reside in the forum is not the measuring stick by which the court determines personal jurisdiction. The party must somehow reach out to the forum, avail himself or herself to the laws of the forum, and derive some benefit, regardless of how minimal, from the forum's legal protections. No such minimum contact exists here.

Moving next to the other contact, the plaintiff includes a series of letters

11

with his brief in opposition showing some communications between the defendants' attorneys in New Jersey and his attorney in Pennsylvania. The defendants sent letters to the plaintiff's attorney on October 17, 2012, December 4, 2012, January 4, 2013, March 15, 2013, and July 3, 2013. (Doc. 10, Att. 2, 3). The defendants' lawyers also sent emails to plaintiff's counsel on October 19 and December 5, 2012. (Id., Att. 2). The defendants' letter of March 15, 2013 also notes a number of phone calls to the plaintiff's attorney that went unreturned. The sum and substance of these communications encompass the parties moving the closing date to November 2, 2012 and then the defendants repeated attempts to void the agreement per the financing clause. The court does not find these seven contacts sufficient to satisfy the minimum contacts requirements. A brief discussion of the cases cited by the plaintiff is necessary to put these communications in the proper context.

The plaintiff relies primarily on two cases to support his contract-contact theory of personal jurisdiction. In *O'Connor v. Fischbein*, 2010 WL 1053220 (E.D.Pa. March 16, 2010), the defendant was a contracted employee of a Pennsylvania professional corporation (a law firm), but worked in New York. *Id.* at \*1. The plaintiff, per the terms of the employment contract, agreed to loan the defendant $250,000. After the defendant was terminated, the plaintiff corporation demanded the loan be paid back in installments over a three-year period. The defendant sent five letters and made one phone call to the

12

corporation's Philadelphia office before the litigation commenced. *Id.* at \*4. *O'Connor* dealt with an individual who contracted to work for a Pennsylvania corporation. Moreover, the defendant borrowed money from that corporation based on the terms of his contract. He was paid a salary by the Pennsylvania corporation in exchange for his services. Although that court specifically noted the letters and phone calls, the nature of the contract, including the loan provision, supported finding personal jurisdiction. No such relationship exists here with an established Pennsylvania entity. This case springs from a failed property transaction for land in New Jersey. The contact here does not intertwine the defendants to a Pennsylvania corporation via an employment agreement or create any ongoing obligations to the forum state.

The other case cited by the defendant, *Remick v. Manfredy*, 238 F.3d 248 (3d. Cir. 2001), is in line with *O'Connor* and does not mirror the facts presented here. In that case, a defendant reached out to a Pennsylvania law firm for representation in contract negotiations. The parties entered into a fee agreement governed by the Pennsylvania Rules of Professional Conduct and Pennsylvania law. *Id.* at 256. The defendant sent at least one payment to the plaintiff per the contracts requirements and the plaintiff conducted various legal services on the defendant's behalf in Pennsylvania. *Id.* Again, the defendant purposefully engaged in an on-going relationship with a Pennsylvania entity for services springing from the forum state. Moreover, the attorney-client relationship is akin to agency, making the attorney's actions in

13

Pennsylvania attributable to the defendant. Here, the agreement merely involved a Pennsylvania owner and his attorney negotiating a sale of New Jersey property per a real estate contract governed by New Jersey law. This forum's involvement is incidental to the agreement and does not form the basis of any on-going or future impact within the forum.

Taken together, *O'Connor* and *Remick* follow the *Burger King* line of reasoning in that the nature of the relationship formed by the contract is central to the analysis. Although those courts considered the communications between the parties, it was the defendants who reached out to the forum and engaged in contractual activity within the forum itself. Those contacts reasonably brought the defendants within the state's jurisdiction as they benefitted directly from the laws and protections afforded by those respective forum states. A contract to convey real estate in another state does not require the same obligations that an employment contract, a legal representation agreement, or franchise relationship entail. Further, it was obvious to both defendants in *O'Connor* and *Remick* that when they engaged in such conduct, i.e. reaching out to the forum for specific purposes, the entirety of their activity was directed toward Pennsylvania. Here, the defendants attempted to purchase property in New Jersey through their New Jersey realtor. Moreover, they signed an agreement under New Jersey law requiring the funds to be held by the plaintiff's New Jersey realtor. *See Mellon Bank*, 960 F.2d at 1226 (sufficient minimum contacts when defendants

14

solicited business from Pennsylvania bank, received a loan from that bank, secured loan by mortgaging property and personal guarantees to that bank, and had direct contact with the bank, including loan payments). Finally, the contract, aside from being mailed to the plaintiff in Pennsylvania, did not involve Pennsylvania law or establish any lasting relationship with the forum state.

In light of those decisions and the above discussion, the court finds the five letters and two emails do not constitute sufficient contact with this forum given the nature and purpose of the contract. The defendants' relationship to Pennsylvania is tenuous and incidental by way of the plaintiff's residency. As such, the court lacks personal jurisdiction and is compelled to dismiss this action. As that determination is dispositive, the court need not address the defendants' other arguments.

## V.    Conclusion

For the reasons discussed above, the defendants' motion to dismiss, (Doc. 7), is **GRANTED**. An appropriate order shall follow.


*s/Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: March 6, 2014**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-1979-01.wpd